Good morning and may it please the Court, Caitlin Shannon for the Appellant, Sterling Centrecorp Inc. I would like to reserve three minutes for rebuttal. This morning I will address two of the liability arguments. We believe that de facto merger is adequately addressed in the briefing and I do not plan to address it here. I will then briefly address one point on our counterclaim for operator liability and one point on our remedy selection challenge. In the Phase I bench trial, the trial court erred when it concluded that Sterling explicitly and implicitly assumed the circle liabilities of Lava Cap Gold Mining Corporation. Under California law, specifically the Swenson case, laws that are enacted after parties execute a contract do not become part of that contract unless the parties clearly indicate that that was their intent. In the language of the 1952 Asset Purchase Agreement, there is not a clear indication that Sterling intended to assume the then unknown and non-existent circle liability of Lava Cap. Indeed, that agreement says nothing about environmental liability at all. But it doesn't say there's any limit to the liability they undertake either. I actually disagree with that characterization. In the text of the agreement itself, it contrasts the assumption of all of the assets with the liabilities that they've been duly advised of. And so there is some limitation on the liabilities that have been assumed. The trial court... Well, I saw your four arguments. One is you want to suggest that the word the makes a particular difference in that particular matter. However, I guess I'm having a tough time with that one because the liabilities, without any limitation in the agreement or elsewhere, most logically includes all of them. We recognize that here there is a reading of the agreement where the agreement may be ambiguous. You know, there's a lot hanging on the word the. However, the California standard is that there must be a clear intention to assume the liabilities. And an ambiguous reading of an agreement is not a clear intention to assume it. Moreover, the... Well, that's supposing that I suggest that the is ambiguous. And I'm trying to say I don't understand why it is. I read that pretty clear. They're going to get all the liabilities of LCGMC without any limit. There was no limitation in the agreement, no limitation elsewhere. Why would it not be all? We disagree that there's no limitation elsewhere. Where else? Where's the elsewhere? Well, sure. The language and the assumption does say that they're duly advised of the liabilities, which limits them to liabilities that may be known at the time. Moreover, there was an addendum with the agreement that did identify liabilities that were assumed. There's no indication that environmental liability was taken. You're talking about the financial statements? Yes, the financial statements as well as the indication that the agreement would assume the workers' compensation liability as well as insurance. And so here, the trial court did look at extrinsic evidence, such as the conduct of the parties as well as some contemporaneously executed letters, to try to further their indication as to what the intent of the parties were when they tried to assume it. But here, that extrinsic evidence does very little to move the needle beyond what is in the text of the agreement itself. I guess I worry about your argument on the financial statements because it seems to me that one would not necessarily expect indeterminate contingent liabilities to be in the financial statements. That may be true, but here there's... And therefore, if they're not there, I don't know why the financial statements would be somehow a limitation. Well, the financial statements do show a limitation on the type of liabilities that the parties were thinking about at the time the agreement was executed. This is long before... Well, I understand that, but I'm trying to figure out why then the financial liabilities... I looked at the cases you cited that suggest that somehow this financial liability, the footnote as to financial liabilities ought to be what you're suggesting. However, each one of those cases seemed to find narrow language, and it was about that narrow language that was expressly the purchaser's assumption of the liability. This case, there is no narrow language. There is narrow language because in many of the cases we've cited, when courts have found that CERCLA liability was assumed by a pre-CERCLA contract, if you will, something that existed before CERCLA was passed, in nearly all cases, the word all liabilities or something very similar to that, such as liabilities known on the date of closing and arising thereafter, or something to that extent, and that language is not in the 1952 agreement. What else would have been excluded? So what liabilities did they assume? Well, certainly we would see contingent liabilities such as the ones we're talking about here would be excluded. But also it's important to remember the type of the agreement that's in place here where there's a parent and a subsidiary. So this is not a circumstance where there may be no environmental liability at all. But to the extent that the parties knew about it, which the trial court did look at to California pollution laws at the time or nuisance liability, those sorts of owner liabilities would be running to Keystone in this case, not Sterling. Okay, but then you run headlong into the other findings and conclusions issued by the district court. About whether you were, in fact, the person who assumed those liabilities being the corporate owner. Sure, and that actually moves very nicely to this issue of direct operator liability because I would push back that there were findings that I've just run headlong into. And the reason being, this is not an indirect liability case. And under the best food standard, Justice Souter tried, pardon, was very clear to distinguish between direct operator liability where you look at what the parent was doing at the site versus indirect liability where you look at what the parent's doing with the subsidiary. There was no piercing of the corporate veil in this case. The government did not proceed under that theory of indirect liability. And so, to the extent, as I was mentioning. I'm sorry. I thought that the district court found ample evidence that Sterling was involved here and involved directly, including evidence of what personnel were involved, what letterhead was used, and so on. So we have a number of findings of fact. So are you contesting those findings of fact? Yes, and let me be clear about this. Specific to the direct operator liability standard, we are contending that the trial court committed a clear error on its factual findings. Okay. Which findings? Specifically going to which hat Gilbert was wearing at the time. Can you give me the paragraphs that you believe where the district court committed clear error? That would be helpful. Sure. I actually don't have those. But during my rebuttal, I will be happy to bring them to your attention, the specific findings. But here, what happened was the trial court concluded that it was unclear as to whether Gilbert was involved with Keystone in 1979 when responding to the cleanup and abatement order, but that he was an officer director of Sterling. And that is the exact opposite of what the government's expert testified to. And that testimony can be found in the record at 734 to 36, and then 830 to 836. Why would you need expert testimony on whether somebody's an officer and a director? Isn't that just a factual issue? The expert at the time was testifying about documents that are in the record. So for example, we do have Sterling board meeting minutes that show that he becomes the executive vice president of Sterling after the cleanup and abatement order is issued. We also do have a lease that was executed by Gilbert as the president of Keystone in 1978. So we do have, I agree with you, it's a factual issue. There are documents in the record that were being testified about. But the reason this is so significant is because there's only a two-month window where there's actual on-site activity taking place in response to the cleanup and abatement order. And during those two months, October and November of 1979, Gilbert only had one hat to wear, and it was a Keystone hat. And the documents are consistent with this. The cleanup and abatement order was issued to Keystone. Gilbert retained Cranmer Engineering. Cranmer responds to the Regional Water Control Board saying, Keystone's hired me to respond to this. And then Cranmer comes on site and does the work to address the cleanup and abatement order. And that's all entirely consistent with Gilbert acting, in his capacity, as president for Keystone. Well, it's interesting that the stuff the district court relies on is that Gilbert directed response actions at the site using the Sterling letterhead, was often addressed in his capacity as a Sterling official, that the Regional Water Board mailed its order to enforce the monitoring to Gilbert in Canada, addressing it to him as a Sterling official capacity, that Gilbert directed the response using the Sterling letterhead, that he was addressed as a Sterling official throughout the process, and in fact, that he acted on Sterling's behalf, that his actions benefited Sterling and not Keystone, that he spent over $20 million on oil and gas development rather than in fixing the dam. Yes, Your Honor. Those are the ways that the district court, and those are the clear error things that I've got to find were wrong. Well, Your Honor, the timing of those factual findings are significant, because Best Foods is very clear that it's entirely appropriate for a parent and a subsidiary to have shared directors or officers. And so later in time, particularly in response to the water monitoring, for example, which happens in 1982, Gilbert was the dual officer. But the actions that are being taken at the site are not contrary to Keystone's interests. In fact... Well, they are, if in fact they should have spent $20 million on getting rid of fixing that dam, and instead they were off doing their oil and gas development. But the record that we have here is a report from Cranmer explaining the steps that were taken in November of 1979 to respond to the cleanup and abatement order, no further communications from the Water Board until three years later when they asked for water monitoring, which Keystone preferred. All that is is arguing the evidence. All we're talking about is their clear error in what the district court found. You've got lots of evidence on your side, but I'm now looking at clear error review, which I was a district court judge, and I don't want the Ninth Circuit reaching down and picking out their own facts when I had facts there under which supported what I did. We understand, Your Honor, but here we're challenging that there was a direct clear error about the characterization of Gilbert's role in 1979, and that that really does impact the legal presumption that we're allowed to have under best foods about which hat someone's wearing later in time. I see my time starting to wind down, so I'd like to briefly address the operator liability. Or the government. Yes. That's good. In phase two, the trial court erred when it determined that the United States was not an operator under L-208. Under best foods, an operator must have managed, directed, or conducted operations specifically related to pollution. And here, under the clear terms of L-208, which was specifically applied to Lava Cap Mine, Lava Cap was prohibited from using any material or equipment to remove waste from the site above or below ground. That is direction under the best foods standard. Was there any exception under the L-208 order that would have allowed them to address an emergency situation? There was an exception in L-208, but the exception was limited to maintaining buildings, machinery, and equipment in repair, and keeping the access and development working safe and accessible. Under a plain reading of L-208, that does not encompass waste. Was any entity of the federal government physically on site? There's no evidence that they... Presumably what the Ward Production Board was doing was actually trying to get the mining equipment moved someplace else, right? It's not really interested in stopping gold. There's no reason for the government to be stopping gold. What they're trying to do is encourage the mining of something else, and probably needed the equipment elsewhere. We actually don't know if they needed the equipment or the personnel, but what we do know is that gold was not an essential metal for the war effort. And so, yes, there was a policy to promote mining of something else. This whole thing sounds in sort of modern vernacular is more like a regulatory taking than it really sounds like the government coming in and operating anything on site. There was no evidence of anybody being physically on site, and I don't know how you'd say the government in any reasonable sense or conversational sense of the term operating was operating the mine. They issued an order and said, stop. Two points on that. The first is even the government's recognized in its briefing that you don't need to be physically present on a site to operate it. And the second point is that Justice Souter chose his words carefully in the Best Foods decision, and he used manage, direct, conduct. You could direct from afar. You could set policies. Is there any correspondence between the mine and the Ward Production Board after L-208 was issued? Just one letter, Your Honor, and what that is... This is the most general of orders. It applies to all gold mines. There's no place that your mine is mentioned. Well, the language of L-208 is general. However, several months after L-208 was issued, there is a letter directly addressed to LavaCap which cancels LavaCap's serial number. And it's that specific decision to apply L-208 to the mine, which has language directing what can be done with the waste that constitutes operator liability. I see my time is up, so thank you. Thank you, Ms. Schein. Mr. Brabender? May it please the Court, my name is Alan Brabender with the United States Department of Justice, and with me at counsel table is John Everett with the California Department of Justice. But I will be using all 15 minutes today for the appellees. We think the most important consideration here is the standard of review. Sterling is approaching this case as if this Court were the fact finder as to liability or the agency as to the remedy. But of course, this Court is not conducting a de novo review on Sterling's liability or on EPA's remedy decision. This Court is reviewing the trial court's liability findings under the highly deferential clear error standard, and the agency's remedy decision... as well as the remedy for Sterling, right? Correct. We're not really talking about the government's liability when we're talking about that? No, that's an issue... That's a different issue. That's a different issue that's reviewed... I just want to make sure. I just want to make sure you're not trying to give the District Court extra deference on a motion to dismiss. I am not, Your Honor. Okay. I am referring to Sterling's liability and the EPA remedy decision. Now, as far as Sterling's liability, after a four-day trial, the District Court found Sterling liable for response costs on three different grounds, any one of which is sufficient to find Sterling liable. Direct liability, assumption of liability, and liability by way of de facto merger. So let's start with direct liability. Sterling is directly liable because it directed the response to the Water Board's cleanup and abatement order following the collapse of the log dam in 1979. Under United States v. Best Foods, if any act operating the facility is done on behalf of the parent corporation, the parent corporation is directly liable. So one of the questions at trial was whether Jack Gilbert, who directed the response, whether he did so solely on behalf of Keystone or whether he took any act, any act at all, on behalf of Sterling. And after hearing the evidence and the testimony for four days, the trial court found that Gilbert directed the response on Sterling's behalf much, if not all of the time, which makes Sterling directly liable. And there was significant evidence for the trial court's finding. First, there was the expert testimony of Dr. Quivik, who looked at the historical records. He is a corporate historian. He looked at the corporate records and found that, in his view, Sterling was acting on or, sorry, Gilbert was acting on Sterling's behalf. Indeed, Gilbert was contractually obligated to act on Sterling's behalf. Gilbert used Sterling's funds to pay for the cleanup because Keystone was essentially insolvent and couldn't pay for the cleanup. And this is important because Gilbert conducted an insufficient response to the cleanup and abatement order. He didn't follow through on the physical improvements that were required by the Water Board. This, as the trial court found, freed up funds for Sterling's resource exploration and exposed Keystone to additional liability. In addition, the contractor conducting the cleanup and the Water Board itself addressed Gilbert as a Sterling official. And Sterling obliged by responding on Sterling, Gilbert obliged by responding on Sterling letterhead. In fact, the trial court found that Sterling's control over the facility was so pervasive that if Keystone acted at all, it acted alongside Sterling in a sort of joint venture. This makes Sterling directly liable. Sterling is also liable by way of an assumption of liabilities. The trial court found that the assumption of liabilities in the 1952 agreement was broad and unfettered and inclusive of all liabilities, both those known and unknown. But yet, unknown and unknown wasn't in the agreement, correct? That's correct. That's a trial court finding. And in fact, what we really have to say about that is that if we agree with the trial court that the arguments that the appellants make have no basis because otherwise we would interpret the contract differently, correct? Because this is really a contract interpretation. That's correct. You think this language of the contract is clear and unambiguous? It is. It says Sterling assumes the liabilities. I think that is as clear as can be. And the financial statements don't say anything about these liabilities. And nothing in the documents suggests anything about CERCLA liability. How can one suggest that it is clear that they then assume those liabilities? Well, under California law, a clear intent of the parties can be found not just by looking at the contract. Of course, you start with the contract and review the contract as a whole, but you also look to the circumstances surrounding the contract, and the court may also look to extrinsic evidence. Does that make it unambiguous if you look to those in California? Yes, it does. So then you can't argue. You argue ambiguity, or do you have to argue unambiguous? I mean, in Idaho, if it's clear and unambiguous, you don't look to any other circumstances to try to interpret. In California, the law is quite different. That's correct. The law in California is quite different. So you can look to the circumstances to see if the contract language, to view your interpretation of the contract language. And the contract, again, is quite clear. It says Sterling assumes the liabilities, and it reserves no liabilities for LAVACAP. And if I may, there is a third grounds, which Sterling's counsel didn't address here today, and that's liability by way of de facto merger. In here, all of the indicia of a de facto merger are present. There was a complete continuity of shareholders here because Sterling purchased LAVACAP with shares of Sterling stock. And the courts have said that the continuity of shareholders is the best indicia of a de facto merger. The other indicia are present as well. But really, Sterling is not arguing much about second through the fourth factors. They're arguing about the first factor, aren't they? The continuity of enterprise. And, of course, there was a continuity of enterprise here. Sterling carried on LAVACAP's business. There was a continuity of personnel. LAVACAP employees became Sterling employees. There was a continuity of assets. There was a continuity of location. And there was a continuity of management because LAVACAP directors became, at least two LAVACAP directors became Sterling directors. So really there's three grounds for liability here, any one of which is sufficient. And unless the court has any questions about Sterling's liability, I will switch to the issue about the United States' liability. The United States never operated the LAVACAP mine. An operator is someone who manages. But you don't have to be on mine to be deemed an operator under CERCLA. That's true. You don't have to be physically present. We would concede that because, obviously, you can direct the workings of the mine from Canada, for instance. But you do have to have direct and specific involvement in the facility itself. Well, how can it be more direct and specific than to quit mining and quit disposing of any waste? Well, I would argue that's indirect in general involvement because it came from a generally applicable order, an order of nationwide effect that was not directed to the LAVACAP mine. It was directed to all gold mines across the country. Are you just saying all you were doing is regulating? That's right. How do you get around United States versus Shell Oil? That's our case. It says it doesn't matter whether the government was regulating or not. Indeed, the only question is whether the government's actions were enough, just like a private entity, to make it an operator. It doesn't have anything to do with regulating. We don't look at that anymore based on Shell Oil. No, in Shell Oil the facts are quite different. I know what the facts are in Shell Oil, but I'm looking at what was the holding thereof. It seems to me that I don't look at whether they were merely regulating. I have to see whether the government's actions were enough, just like a private entity, to make an operator. And I'm having a tough time understanding when you tell them what they can and cannot do that you don't make that leap. Well, Shell Oil doesn't stand for the proposition that mere regulatory acts issued from Washington, D.C., result in operator liability. There was specific involvement in Shell Oil with that particular facility. So it may be the act of a regulator, but there was direct involvement with that specific facility. There is no direct involvement by the warboard in the Lava Cap Mine. It simply issued an order of nationwide effect. Generally applicable orders do not result in circle liability. Well, it isn't a general order because there was a letter, as she has suggested, which made it directly applicable in this particular situation. Well, it was directly applicable because of L-208, not because of the letter itself. It's oftentimes that an agency will issue a regulation and then send out letters informing the regulated community about the regulation. I mean, that happens in almost every case. So I don't find that letter to be persuasive. What are we going to do with Kaiser, which says that its authority to control tests would make the government liable? Well, that would be, I'm not familiar with that reading of Kaiser, but that would be inconsistent with best foods. What I'd say. And even under Order L-208 itself, it is Lava Cap and Lava Cap alone that have the responsibility to keep the facility safe and in good working condition, and that would include remedying any public nuisances on the property. So do we know what the effect of L-208 was other than to stop the mine? Do we know whether mining equipment was moved elsewhere or personnel moved elsewhere? We do not know. But isn't the effect, even finding the government to be an operator, does not give the government liability, correct? All it says is at that point somebody is going to go back and determine if an operator did they have control in this particular situation with the other three factors you've got to find for the circular liability. Correct. And therefore, if I find because of this order and because of the letter that the government is in fact on the hook or could be, the government still has plenty of defenses in this particular action that they can give. We didn't do anything. This is not enough. And what can you prove we even did, that the leak even occurred or any of that? No, unfortunately, that's not how CERCLA works. CERCLA is a strict liability statute. So if the government is an operator, the government would be on the hook for some share of response costs. Now what that share is we don't know. Just a minute. If I look at CERCLA, it seems to me that you've got to prove four things to make that. Right. You'd have to show a release. You'd have to show it's a facility. But those elements, nobody is disputing that those elements are present at the Lavacat mine. So it really comes down to is Sterling or is the government an operator? And if either party is an operator, they're on the hook for response costs. Can they both be operators at the same time? Yes. There are usually multiple operators at any CERCLA site. But in determining operator, you're suggesting then that in determining operator under the government's view, if one is an operator, they're already responsible. They don't have to be proved to have done something to cause this to happen? Well, they have to meet the other elements of CERCLA, such as they have to prove it's a facility or that there is a release or threatened release of a hazardous substance. Yes. But those other elements are not being disputed with respect to the Lavacat mine. So with respect to the Lavacat mine, if one is an operator, one is liable for response costs. So the government concedes all the other? Yes. So there was a release or threatened release back in the early 1940s in addition to the more recent release that's the subject that you're concerned about now? There has been a continuous release since probably before the 1940s until EPA cleaned up the site. And I believe actually there may still be continuing releases now. Unless the court has any additional questions about any of the other issues. Well, I guess there is the question of why the government chose a remedy that was $2.5 million more than an alternative remedy. And according to the appellant, you're still going to have to monitor, so you're not completely out of the picture, so to speak. Well, that monitoring, of course, is related to the groundwater remedy. It's not related to this particular decision to hook some homes up to a pipeline to provide clean public water. And it has to be remembered that EPA took this action because people were drinking water contaminated with arsenic. And it looked at three different alternatives. And it compared the advantages and disadvantages of each of those alternatives against the required factors. And it chose to hook these homes up to the public water supply because it was the most protective alternative and would be the most protective alternative day in and day out for decades to come. And both the state and the affected community preferred that alternative. That was a reasonable, rational choice that is thoroughly explained in the record. And I see my time is up. Unless the court has any additional questions. Thank you, Mr. Brabender. Ms. Shannon, I'll give you a minute. I know that we consumed your time. I will allow you a minute for rebuttal. Thank you. To begin, I would like to point this court to the findings and conclusions of law regarding Gilbert. The findings are 141 to 163, and the specific conclusion of law about which hat he's wearing can be found at 64. Regarding operator liability for the government, here the terms of L-208 were it's a general order issued in 1942. However, it's not until May 12, 1943, that the War Production Board made the specific decision to apply it to Lava Cat Mine, and the serial number for the mine was canceled effective June 1, 1943. So the mine was allowed to continue operating for some period of time after the order was issued, not until it's specifically applied to it is it canceled. And that is sufficient direction under Best Foods because it directed how the waste was to be handled. And very briefly on OU2, here EPA's remedy was arbitrary and capricious because it did not achieve the principal objective of preventing residents from drinking contaminated groundwater because it did not require those residents to cease using their wells. And we know from the record that at least one resident intended to continue using the well. If there are no further questions, we'll submit. Thank you, Ms. Shannon. We thank both counsel for the argument. United States v. Sterling Center Corp. is submitted.
judges: Melloy, Bybee, N.R. Smith